# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STEVE KLEIN, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> STONEMOR PARTNERS L.P., LAWRENCE R. MILLER, SEAN P. MCGRATH, JAMES M. PIPPIS, TIMOTHY K. MCGRATH, and WILLIAM R. SHANE, <br><br> Defendants. | Case No. <br><br> **COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** <br><br> **DEMAND FOR JURY TRIAL** <br><br><br> **CLASS ACTION** |

Plaintiff Steve Klein ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia,* the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding StoneMor Partners, L.P. ("StoneMor" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This securities fraud class action is brought on behalf of persons who purchased common units ("Units") of StoneMor Partners, L.P. ("StoneMor" or the "Company") between January 19, 2012 and October 27, 2016 (the "Class Period"), against StoneMor and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 (the "Exchange Act").

2.      This Action arises out of a fraudulent scheme and wrongful course of conduct whereby Defendants issued materially false and misleading statements regarding the Company's business and financial performance, relying heavily on opportune accounting metrics created (and modified) by the Company which undermined its audited financials, in order to convey to unitholders and the public that StoneMor was a profitable business that was generating significant cash flow from which to pay high yield profit distributions to unitholders.

3.      In reality, these statements were premised on a financial shell game that involved raising fresh capital from investors just in time to distribute a portion of it back to investors and the operators (the Company's senior offices and/or directors) of the scheme.

4.      Essential to this illicit undertaking were Defendants' public condemnations of the Company's financial metrics as audited under Generally Accepted Accounting Principles ("GAAP"), which had the effect of cajoling the market to measure the success (or what inevitably emerged as a lack thereof) of the Company based on non-GAAP financial measures, including but not limited to "Production-based Revenue," "Adjusted Operating Profits," "Distributable Free Cash Flow," and "Adjusted EBITDA." These metrics were regularly used by the Company to promote a veneer of profitability and to enable it to continuously issue additional equity units and access debt markets to raise capital. For example, even though StoneMor said that over time these

2

proprietary measures of the Company's performance would begin to converge with GAAP results, 2015 produced the widest divergence in the numbers in many years, *with GAAP operating income of $1.3 million, while the Company claimed "adjusted" operating income of $67.8 million.*

5.      In reality, these statements were based on misleading non-GAAP financial presentations, created and promoted by the Company itself, in order to falsely mislead investors into purchasing the Company's equity units. The Company's senior management openly expressed contempt for GAAP in its zeal to fraudulently create an illusion of profitability and sustain the scheme. As long as the Company was able to continue selling high-yield securities to new investors, StoneMor were able to continue making distributions to old investors and the managers of the scheme.

6.      Indeed, since becoming a publicly traded company, StoneMor *has never in any year generated sufficient cash flow from operations to make the Company's distributions.* Instead, to keep its high yield shell game going, since 2005 the Company raised $508 million from unsuspecting investors who were led to believe the business was healthy and generating significant cash flow. During this same period, $422 million was paid out as so called "profit" distributions to unitholders. In reality, since its IPO in 2007, *StoneMor has earned Free Cash Flow in aggregate of just $54 million.* Thus, these unsuspecting unitholders, including Plaintiff and others similarly situated, did not receive a return *on* capital from their investments, but rather they received a return *of* capital from their investment.

7.      The motivation behind this scheme is clear: given StoneMor's unique Master Limited Partnership ("MLP") structure, it answers to its general partner, StoneMor GP, LLC (the "General Partner"). Under the terms of the Company's Limited Partnership Agreement (the "LPA"), *the General Partner receives additional distributions* when the Company issues

distributions above a predetermined threshold. In other words, by ensuring the Company issues quarterly distributions in excess of $0.51/unit, the *General Partner is able to increase the amount of money it receives.* Not surprisingly, one of the chief architects of the scheme — the Company's CEO Lawrence Miller ("Miller") — serves as a director of both StoneMor *and* the General Partner, and is thus one of its chief beneficiaries.

8.     Nevertheless, like all such schemes, the Company's came to a quick end when StoneMor could no longer raise fresh capital with which to pay distributions, which, in turn, caused its perception of success to evaporate. On September 2, 2016, the Company announced it was going to restate its financials to correct various errors. The Company took over two months to file its restatements. On information and belief, during the pendency of its restatement, the Company was unable to — and in any event did not — sell new units or raise new capital from investors. This failure to obtain fresh capital seriously constrained the ability of the Company to pay its inflated "profit" distributions. The SEC has since prohibited the Company from relying on its misleading Adjusted EBITDA (non-GAAP) financial metric moving forward.

9.     On October 27, 2016 with no new capital infused into the Company since at least June 30, 2016, StoneMor was forced to materially cut its distribution in half. At this point, investors could begin to see the depth of the Company's prior deception about the health of its business. While the whole truth underlying the reasons for that reduction in distribution price have not yet been made public, the announcement nonetheless shocked the market, causing the price of StoneMor units to *drop by over 45%* by the close of trading the following day on heavy volume. Accordingly, plaintiff and other members of the Class suffered substantial economic harm.

10.     Then, on November 9, 2016, StoneMor filed a Current Report on Form 8-K with the SEC announcing the need to "amend its Form 10-K for fiscal year ended December 31, 2015,

4

and its Forms 10-Q for the quarterly periods ended June 30, 2016 and March 31, 2016." It was, then, first revealed that these restatements came on the heels of a review by the SEC who, subsequently, required the Company to change "the format of [its] earnings release ... [such that it,] will no longer be able to provide Adjusted EBITDA [a non-GAAP measure heavily relied on by the Company] as a performance metric within future earnings releases."

11.     Thus, with no new capital and unable to rely on previously used misleading non-GAAP financial metrics, the Company's fraudulent scheme came to a crashing end that day, but not before leaving untold scores of investors victimized by material misstatements about the nature and health of the business.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R § 240.10b-5.

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

14.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b), as Defendant StoneMor is headquartered in this Judicial District.

## PARTIES

15.     Plaintiff, as set forth in the attached Certification, acquired StoneMor common units at artificially inflated prices during the Class Period, and suffered damages as a result of the federal securities law violations and false and misleading statements and/or material omissions alleged herein.

16.    Defendant StoneMor is a Delaware limited partnership headquartered at 3600 Horizon Boulevard, Trevose, Pennsylvania 19053.

17.    Defendant Lawrence Miller was, at all relevant times, Chief Executive Officer ("CEO"), President, and Chairman of the Board of Directors of StoneMor. Miller is the founder of the Company.

18.    Defendant Sean P. McGrath ("McGrath") served as the Chief Financial Officer of the General Partner since 2015.

19.    Defendant Timothy K. Yost ("Yost") served as the CFO of the General Partner from April 1, 2012 through May 13, 2015.

20.    Defendant Robert B. Hellman, Jr. ("Hellman") has served on the Board of Directors of the General Partner since StoneMor's formation in April 2004. As per the Company's public filings, Defendant Hellman maintains "exclusive voting and investment power over 67.03% of membership interests in the General Partner." Further, Defendant Hellman also co-founded American Infrastructure MLP Funds in 2006, which committed at least $130 million to the Company during the Class Period, enabling StoneMor to pay out distributions to unitholders.

21.    Defendants StoneMor, Miller, McGrath, Hellman, and Yost are referred to herein as the "Defendants."

22.    Defendants Miller, McGrath, Hellman, and Yost are referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

23.    According to its public filings, StoneMor is the second-largest provider of funeral and cemetery products and services in the death care industry in the United States. As of March

31, 2016, StoneMor operated 307 cemeteries in 27 states and Puerto Rico, of which 276 are owned

and 31 are operated under lease, management or operating agreements. StoneMor also owned and

operated 104 funeral homes in 19 states and Puerto Rico.

24.     The Company sells cemetery products and services both at the time of death, which

StoneMor refers to as "at-need," and prior to the time of death, which the Company refers to as

"pre-need." In a "pre-need" sale, the customer pays cash up front to the Company for funeral

merchandise and services to be provided at an unknown future date.

25.     Over the course of the Class Period, StoneMor successfully renegotiated its credit

facility agreements, increasing the Company's line of credit significantly over time. It also

persistently diluted unitholders through multiple public offerings, private placements, and debt

offerings. Together, StoneMor created the fallacy that it had adequate cash on hand to justify, and

payout, a quarterly profits distribution, which triggers incentive payments owed to the General

Partner, including certain executives and board members, under the LPA.

26.     Per the Company's April 14, 2016 Registration Statement (described in detail

below), the General Partner:

> Currently holds incentive distribution rights that entitle it to receive increasing
> percentages, up to a maximum of 49.21%, of the cash [StoneMor] distributes from
> operating surplus in excess of $0.5125 per unit. The maximum distribution of
> 49.21% includes distributions paid to the general partner on its 1.21% general
> partner interest, and assumes that the general partner maintains its general partner
> interest at 1.21%, but does not include any distributions that the general partner
> may receive on units that it owns.

27.     Throughout the Class Period, StoneMor continued to make quarterly distributions

that either stayed consistent or increased. The Company's quarterly distributions (and annual

totals) are summarized below:

| Announcement Date | Price Per Unit |
|---|---|
| 1/25/2012 | 0.585 |
| 4/25/2012 | 0.585 |
| 7/20/2012 | 0.585 |
| 10/22/2012 | 0.59 |
| **2012 TOTAL** | **2.345** |
| 1/25/2013 | 0.59 |
| 4/24/2013 | 0.595 |
| 7/23/2013 | 0.60 |
| 10/25/2013 | 0.60 |
| **2013 TOTAL** | **2.385** |
| 1/27/2014 | 0.60 |
| 4/24/2014 | 0.60 |
| 7/25/2014 | 0.61 |
| 10/24/2015 | 0.62 |
| **2014 TOTAL** | **2.43** |
| 1/26/2015 | 0.63 |
| 4/24/2015 | 0.64 |
| 7/24/2015 | 0.65 |
| 10/27/2015 | 0.66 |
| **2015 TOTAL** | **2.58** |
| 1/26/2016 | 0.66 |
| 4/26/2016 | 0.66 |
| 7/25/2016 | 0.66 |
| 10/27/2016 | 0.33 |
| **2016 PROJECTED TOTAL** | **2.31** |

### False and Misleading Statements

28.     The Class Period begins on January 19, 2012. On that day, StoneMor amended its credit agreement to combine its credit facilities into one revolving credit facility, increased the borrowing commitment by $10.0 million, extended the maturity date to January 19, 2017, and amended the interest rate and certain financial covenants.

29.     On March 15, 2012, StoneMor issued a press release and filed a Current Report on Form 8-K with the SEC announcing the above mentioned amended credit agreement and results

of operations, highlighting various "critical financial measures" for the three months and year ended December 31, 2011, which "include both GAAP measures as provided for in our quarterly and annual financial statements, and non-GAAP measures that *we believe are relevant to our ability to make cash distributions to common unitholders.*"

30. Review of the March 15, 2012 8-K shows significant discrepancies between the Company's GAAP and non-GAAP measures. For example, for year-end December 31, 2011, Total Revenues (a GAAP figure) equaled approximately $58.73 million compared to Production Based Revenue (a non-GAAP figure) which was reported as approximately $75.87 million for the same period; Operating Profit (a GAAP figure) equaled approximately $9.8 million as compared to Adjusted Operating Profit (a non-GAAP figure) for the same period of approximately $48.55 million; Operating Cash Flow (a GAAP figure) reportedly equaled approximately $5.47 million while Adjusted Operating Cash Generated and Distributable Free Cash Flow Generated (both non-GAAP figures) for the same period equaled approximately $50.7 million and $49.3 million, respectively.

31. Using these figures, StoneMor touted its "strong ratio of total liquid net assets to our cash distribution," noting, in particular, how the Company's "distribution coverage increased to 8.61 at December 31, 2011 compared to 5.36 at December 31, 2010." During this period, StoneMor declared a distribution of $0.585 per unit.

32. Nearly two months later, on May 9, 2012, StoneMor filed a Current Report on Form 8-K with the SEC, and issued a press release, announcing its results of operations and various "critical financial measures" for the three months ended March 31, 2012. Again, StoneMor focused investors' attention on non-GAAP measures, which varied discernably from the Company's GAAP financial results. In the May 9, 2012 Form 8-K, StoneMor reported Total

9

Revenues of approximately $59.59 million, Production Based Revenue of approximately $72.27 million, Operating Profit of approximately $5.4 million, Adjusted Operating Profit of approximately $14.76 million, Operating Cash Flows of approximately $8.19 million, Adjusted Operating Cash Generated of approximately $14.387 million, Distributable Free Cash Flow Generated of approximately $13.82 million, and Distribution Coverage Quarters of purportedly 8.77. During this period, StoneMor declared a distribution again of $0.585.

33.     Commenting on the quarter, Defendant Miller expressed satisfaction with the Company's financial performance, stating in relevant part, "We have increased our production based revenue and total GAAP revenues for the three months ended March 31, 2012. Further we have increased both our operating profit and adjusted operating profit for the same period and we continue to generate strong distributable free cash flow."

34.     On August 7, 2012, StoneMor released its results of operations and its financial condition by issuing a press release, which was attached as an exhibit to its Current Report on Form 8-K filed with the SEC on the same day. Notably, the August 7, 2012 Form 8-K reported that Revenues (GAAP) for the three months ended June 30, 2012 increased by $1.4 million, or 2.3% to $61.5 million while Production Based Revenue (non-GAAP) for the same period increased by $5.6 million, or 8%, to $75.6 million. Further, it was reported that Operating Profits (GAAP) decreased to $1.8 million while Adjusted Operating Profits (non-GAAP) increased to $12.6 million as compared to the same period last year.

35.     Defendants emphasized the non-GAAP results to the expense of the GAAP financials, calling investors' attention to "the gain in production based revenue and adjusted operating profit [which purportedly] underscore [their] commitment to growth and profitability despite the economic background." Moreover, these measures "allow the investor to gain insight

into the current operating performance of the company." StoneMor again kept its distribution rate unchanged, declaring a distribution of $0.585 for the quarter.

36.     On November 6, 2012, StoneMor filed a Current Report on Form 8-K with the SEC, and issued a press release that was attached as an exhibit thereto, announcing its financial results for the three months ended September 30, 2012. Therein, Defendant Miller boasted about the strength of the quarter, highlighting the Company's non-GAAP financial metrics and stating in relevant part, "we experienced double digit percentage increases in our key performance metrics on a year over year basis, with production based revenue rising 11.4%, adjusted operating profits rising 60.7%, and distributable free cash flow increasing 74%." He also emphasized the Company's decision to increase its distribution from $0.585 to $0.59 per unit, citing "the strength of our business and our commitment to generate increasing returns for our unit holders."

37.     By year end 2012, the Company distributed approximately $47.45 million to its unitholders after raising $89.0 million through equity transactions.

38.     On February 19, 2013, StoneMor filed a Current Report on Form 8-K with the SEC announcing a change in the Company's credit agreement entered into the previous year. Notably, StoneMor negotiated another $10 million increase in the maximum aggregate principal amount of the revolving credit facility under the credit agreement from $130.0 million to $140.0 million.

39.     Just under a month later, on March 15, 2013, StoneMor filed its Annual Report on Form 10-K with the SEC for the period ending December 21, 2012, and reported that:

- Revenues (GAAP) improved from $228.4 million in 2011 to $242.6 million in 2012, a 6% increase.

- Production Based Revenue (non-GAAP) increased from $280.6 million in 2011 to $296 3 million in 2012, a 6% increase.

- Operating profits (GAAP) increased 41% to $13 8 million in 2012 as compared to $9.8 million in the 2011 year.

11

- Adjusted operating profits (non-GAAP) increased 11% to $53.8 million in 2012 from $48.6 million in 2011.

- Operating cash flows (GAAP) provided in the 12 months ended December 31, 2012 increased to $31.9 million from $5.5 million provided by operations in 2011, a 480% increase.

- Distributable free cash flow (non-GAAP) for 2012 was $53.3 million compared to $49.3 million for the same period last year, an 8% increase.

- Distributable cash available during the period (non-GAAP) exceeded distributions by $17.9 million for the year ended December 31, 2012, versus $12.2 million in 2011, a 47% increase.

40.     Then, on March 22, 2013, StoneMor announced that it had priced 1.4 million common units representing limited partner interests in StoneMor at a price to the public of $25.35 per unit (the "March 2013 Offering"). Underwriting the March 2013 Offering was Raymond James & Associates, Inc. ("Raymond James") and Janney Montgomery Scott LLC ("Janney"), who, collectively, had an option to purchase up to an additional 210,000 common units at the public offering price, less an underwriting discount. Accordingly, the Company anticipated proceeds of approximately $33,810,000 at the close of the offering; the net proceeds of which the Company intended to use "to pay down borrowing outstanding under [StoneMor's] credit facility."

41.     StoneMor would announce an increase of its cash distribution to $0.595 per unit from $0.59 on April 24, 2013. Defendant Miller would praise StoneMor's "second distribution increase in six months," and credited "all of [the Company's] growth strategies, i.e. cemetery acquisitions, funeral home acquisitions, etc. [as having] been on display of late and [stating how] this distribution increase is a reflection on our ability to successfully implement these strategies."

42.     On May 7, 2013, StoneMor announced its first quarter 2013 financial results by issuing a press release and filing a Quarterly Report on Form 10-Q with the SEC for the three months ended March 31, 2013 (collectively, the "1Q13 10-Q"). As was the case with the

Company's previous filings, StoneMor reported both GAAP and non-GAAP financial results. This time, however, Defendant Miller attempted to undermine the Company's poor GAAP results by claiming that "our GAAP results were impacted, as they often are, by the timing of the recognition of certain revenues, which in turn impacted GAAP operating profit" and then drawing attention to "production-based revenues ... [and] adjusted operating profits and distributable free cash flow [which] each showed impressive growth." Specifically, the Company reported Revenues (GAAP) of $59.6 million compared to Production-based Revenue (non-GAAP) of $80.2 million, which represented an increase of $7.9 million or 11% from the production-based revenue recognized the previous year. Further, it was reported that Operating Profits (GAAP) decreased by $4.0 million, or 74%, to $1.4 million for the three months ended March 31, 2013, as comparted to $5.4 million in the prior-year period. Yet, Adjusted Operating Profits (non-GAAP) curiously increased by $2.9 million, or 20%, to $17 7 million compared to $14.8 million in the same prior-year period. And, finally, Operating Cash Flows (GAAP), purportedly decreased by $1 3 million, or 16%, to $6.9 million (compared to $8.2 million the previous year), while Distributable Free Cash Flow (non-GAAP) increased to $17.6 million from $13.8 million for the same prior-year period, representing a 28% increase.

43.     Following this release, StoneMor and its wholly owned subsidiaries, StoneMor Operating LLC, Cornerstone Family Services of West Virginia Subsidiary, Inc., and Osiris Holding of Maryland Subsidiary, Inc., announced on May 15, 2013, a cash tender offer to purchase any and all of their outstanding $150 million aggregate principal amount of 10.25% senior notes due 2017. In connection therewith, and as a means to fund the tender offer, StoneMor announced that it and its subsidiaries priced a private offering to eligible purchasers of $175 million aggregate principal amount of Senior Notes due 2021. On May 24, 2013, StoneMor

13

announced that it had received by the expiration date, tenders and consents from the holders of approximately $132.2 million in aggregate principal amount, or approximately 88.1% of their outstanding 10.25% senior notes.

44.     Just five days later, claiming that the above actions were expected to result in a cash interest savings of approximately $1.6 million per year, StoneMor announced an increase in its distribution. Defendant Miller, commenting on the Company's recent activity, said in relevant part, "In addition to managing our financial profile we are also committed to creating value for our unitholders. The savings created by these actions, along with continued financial performance allow us to increase our distribution by a half a cent per quarter, the third such increase in the past eight months."

45.     On July 23, 2013, StoneMor announced a quarterly cash distribution of $0.60.

46.     On August 7, 2013, StoneMor issued a press release and filed its Quarterly Report on Form 10-Q with the SEC announcing its financial results for the period ended June 30, 2013 (collectively, the "2Q13 10-Q"). Therein, Defendant Miller provided additional reasons for the Company's poor GAAP results, including the costs associated with the refinancing of the Company's 10.25% Senior Notes in May 2013. Accordingly, Defendant Miller shifted focus towards the Company's "other key performance measures," including "production-based revenues and adjusted operating profits, [which] showed solid year over year improvement." For the period, Revenues were $62.4 million compared to $61.5 million, a 1.5% increase, while Production-based Revenue increased by $4.0 million, or 5.3%, to $79.6 million. Further, Operating Profits increased by $0.5 million, or 29.4%, to $2 3 million, while Adjusted Operating Profits increased by $1.1 million, or 8.2%, to $13.7 million.

47.     In October, the Company announced an unchanged quarterly distribution of $0.60.

14

48.     Then, on November 7, 2013, the Company issued a press release and filed with the SEC its Quarterly Report on Form 10-Q for the period ended September 30, 2013 (collectively, the "3Q13 10-Q"). Defendant Miller, once again, offered an excuse for the Company's GAAP financials, citing "a land sale of $2 2 million to a private estate as impacting quarterly comparisons." As such, he drew the market's attention toward the Company's non-GAAP results, stating:

> We are very happy that production-based revenue and adjusted operating profits both reflected solid gains due to increases in the value of pre-need cemetery contracts written, gains in investment income from trusts and strong funeral home revenues. We believe that production-based revenues and adjusted operating profits are meaningful measures for evaluating our performance because, among other items, they make adjustments for timing related items we referred to previously. They are the measure by which management conducts the company's business and evaluates its performance.

49.     Once again the Company's non-GAAP financials turned otherwise negative results into positives. For example, the 3Q12 10-Q noted that Revenues were $61.5 million, down 1.1% from the prior-year period, but Production-based Revenue purportedly increased $5.5 million, or 7.3%, to $80.6 million when compared to the same period the previous year. Operating Profits also decreased by $4.4 million, or 85.5%, to $0.7 million, but Adjusted Operating Profits apparently increased 4.2%, or $0.6 million, to $15.2 million.

50.     By year end 2013, the Company distributed approximately $52.05 million to its unitholders after raising $38.38 million through equity transactions.

51.     On January 27, 2014, the Company announced its fourth quarter cash distribution, which remained at $0.60 per unit, payable February 14, 2014.

52.     Before the Company released its cash distribution for the fourth quarter of 2013, it announced another public offering. On February 11, 2014, StoneMor priced 2 million common

units representing limited partner interest in StoneMor at a price to the public of $24.45 per unit (the "February 2014 Offering"). The underwriters for the February 2014 Offering were Raymond James and Janney, who were, again, granted a 30-day option to purchase up to 300,000 additional common units. All in, the Company expected to receive "net proceeds of approximately $46.1 million (or approximately $53.1 million if the underwriters exercise their option to purchase an additional 300,000 common units), after deducting the underwriting discount and offering expenses in connection with this offering." Once again, the Company expressly stated that it "intends to use the net proceeds from the common units it is offering to pay down borrowings outstanding under its existing credit facility."

53.     StoneMor then, on March 14, 2014, issued a press release and filed its Annual Report on Form 10-K with the SEC for the period ended December 31, 2013 (collectively, the "FY2013 10-K"). Recognizing that the Company's GAAP financial results for the full year were somewhat "mixed," Defendant Miller directed investors' attention to StoneMor's "production based revenue, adjusted operating profits and distributable cash flow," claiming, yet again, that they are particularly useful in evaluating StoneMor's performance. He continued, "...we are very pleased that each measure showed strong improvement on a full year basis," and explicitly highlighted the Company's "production based revenues [which] increased almost 34% to $50.8 million." Comparatively, GAAP Revenues for fiscal year 2013 only increased 1.6% year over year. And, again, the Company spun negative numbers into positives: Operating Profits decreased 53.6% (purportedly due to a decline in cemetery revenues and an increase in funeral home expenses), but Adjusted Operating Profits increased 24.9% year over year.

54.     In the FY 2013 10-K, Defendant Miller also expressed excitement over the "strategic actions [] taken in 2013 as well as so far in 2014, [calling out the results of the February

2014 Offering] when a recent unit offering raised approximately $53.1 million, *primarily for the purpose of paying down borrowings."*

55.     Defendant Miller assured investors that the Company "paid down its credit facility with the proceeds of the unit offering [*i. e.,* the February 2014 Offering]" in StoneMor's Quarterly Report on Form 10-Q filed with the SEC on May 8, 2014 (the "1Q14 10-Q"). The 1Q14 10-Q, and its accompanying press release, also noted that StoneMor "generated increases in both our GAAP revenue and production based revenue (non-GAAP) during the period. At the same time, [StoneMor] saw strong increases in both operating profits and adjusted operating profits (non-GAAP) while generating a solid increase in distributable free cash flow."

56.     A few days later, first mentioned on May 19, 2014, but later closed on May 21, 2014, StoneMor announced a $130 million commitment by a private investment firm, American Infrastructure MLP funds ("AIM"). AIM, which was co-founded by Defendant Hellman, committed up to $130 million of capital to StoneMor and the General Partner, in exchange for an indirect majority interest in the General Partner. As part of the commitment, AIM agreed to *"purchase $55 million of four-year, non-cash common units to fund near-term acquisitions, and lj make available up to $50 million of additional capital contributions to fund growth."*

57.     Approximately ten days later, StoneMor issued a press release entitled, "StoneMor Partners L.P. Prices Public Offerings of Common Units," wherein it was announced that the Company priced 2.6 million common units representing limited partner interests in StoneMor at a price to the public of $23.67 per unit (the "May 2014 Offering"). Accordingly, the Company estimated receiving "net proceeds of approximately $58.2 million from this offering after deducting underwriting discounts and offering expenses ($67.0 million if the underwriters exercise in full their option to purchase additional common units.)" Underwriting the May 2014

Offering was Raymond James and Barclays Capital, Inc. ("Barclays"), acting as the representatives of Janney and BB&T Capital Markets ("BB&T").

58.     As per the May 2014 Offering prospectus that was filed pursuant to Rule 424(b)(5), the Company "intend[ed] to use approximately $53.8 million, subject to certain adjustments, ... to first pay the purchase price for the SCI Assets (described therein) and the remainder of the net proceeds to pay down borrowings outstanding under [the Company's] credit facility." The prospectus further insured that the Company would use "all the net proceeds from [the] offering to pay down borrowings outstanding under [its] credit facility" should the SCI acquisitions not close.

59.     After receiving capital infusions directly from the February 2014 Offering, the private placement with AIM, and the May 2014 Offering, StoneMor announced, on July 25, 2014, an increase of its cash distribution to $0.61 per unit from $0.60. Suggesting that the reason for the increase was due to the Company's strong performance and recent transactions, Defendant Miller all but guaranteed continuing increases in distributions through 2015:

> With the strong performance of our base operations and the results we're beginning to see from these two transactions *[i.e.,* the SCI Acquisitions and a long-term management relationship with the Archdiocese of Philadelphia], we believe we should be able to increase distributions by at least $0.01 per unit each quarter through 2015. Lastly, although we can make no assurances, with the addition of the recently announced investment from a private equity firm *[i.e.,* AIM], we hope to continue the upward trajectory of the distribution beyond that time frame.

60.     In August, StoneMor reaffirmed its intent to raise future distributions. On August 8, 2014, for example, the Company issued a press release and filed with the SEC a Quarterly Report on Form 10-Q, wherein Defendant Miller provided guidance on future distributions, stating in relevant part:

> As we previously announced, these transactions, in combination with our existing core business, provided us the ability not only to increase our distributions, but to

18

also for the first time give guidance that we intend to increase our distribution by $0.01 per quarter at least through the end of 2015. That will make our distribution at the end of 2015 $0.66 per quarter or $2.64 per year. That is an increase of approximately ten percent from today's levels.

61.     After announcing a $0.62 distribution on October 24, 2014, StoneMor, on November 7, 2014 filed its Quarterly Report on Form 10-Q with the SEC for the three months ended September 30, 2014. Defendants continued to tout both GAAP and non-GAAP financial results, claiming that "Revenues and Production-based Revenues reached record levels."

62.     On November 12, 2014, Defendant Miller spoke at the Company's Second Annual Investor and Analyst Day. There, Defendant Miller emphasized the predictability of the Company's cash distribution to investors:

> We don't have a straight trajectory growth in our distributions. But one thing you can count on is the stability and the predictability. And if you followed any of our press we've actually committed to increasing the distribution a penny each quarter, at least through 2015 and we'll explain that a little bit later.

63.     At the same Investor and Analyst Day, then-CFO Yost argued that it was the Company's GAAP financials that were misleading, calling for investors to rely on the Company's manufactured non-GAAP metrics:

> So when you — if you look at our accrual — our operating profit or non-GAAP or old GAAP operating profit, you see steady and consistent increases. It gets confused when you look at the GAAP. The revenues increase, profits increase, but the GAAP results are a little misleading.

64.     Prior to the end of the year, StoneMor entered into another credit agreement (the "December 2014 Credit Agreement"), which had the effect of replacing the previous credit agreement dated January 19, 2012, as amended. As per the Company's Current Report on Form 8-K filed with the SEC on December 23, 2014, the December 2014 Credit Agreement "provides for a single revolving credit facility of $180 million maturing on December 19, 2019."

Additionally, the credit agreement provides for an uncommitted ability to increase the credit facility by an additional $70 million.

65.     By year end 2014, the Company distributed approximately $62.84 million to its unitholders after raising a class period high of $173.50 million through equity transactions, making the Company's guarantee to raise distributions $0.01 per quarter for the remaining of 2014 and all of 2015 feasible.

66.     On January 26, 2015, StoneMor announced by press release yet another increased distribution for the 2014 fourth quarter. In raising its cash distribution to $0.63 per unit from $0.62 per unit, Defendant Miller touted management's ability to "continue [the Company's] recent string of increased distributions to [its] unit holders" and indicated that the announcement further demonstrates "that [the Company is] successfully executing [management's] business plan [who] are confident that [it] will continue to do so."

67.     On March 13, 2015, StoneMor issued a press release announcing its fourth quarter and fiscal year financial results, offering the same information to the SEC on Form 10-K, which was filed on March 19, 2015. Though year-over-year comparisons were allegedly impacted by "a combination of one-time items as well as the ongoing expenses associated with the build out of pre-need sales programs at the Archdiocese of Philadelphia," Defendant Miller underscored the "tremendous year," StoneMor experienced and claimed that StoneMor was "very well positioned for the future."

68.     The following month, StoneMor increased its cash distribution by $0.01 per unit, from $0.63 to $0.64.

69.     Then, on May 8, 2015, Defendant Miller, once again, began highlighting the Company's non-GAAP financial results—despite their having decreased compared to prior-year

periods—as they portrayed a rosier picture of the Company's financial health when compared to

StoneMor's audited financials. For example, in the Company's Form 10-Q filed with the SEC for

the three-month period ended March 31, 2015, Defendant Miller noted that the Company's:

> ...adjusted operating profits (non-GAAP) for the first quarter were $16.0 million
> versus $22.0 million in the prior year period. Distributable free cash flow (non-
> GAAP) for the first quarter was $15.6 million versus $22.1 million in the prior
> year period. The quarterly declines in both adjusted operating profits and
> distributable free cash flow were both largely the result of two items. First, a land
> sale in the 2014 first quarter added $4 5 million to results and second, income (non-
> GAAP) from trusts in the 2014 first quarter was $3.6 million greater than the
> current quarter. Land sales are by their nature unpredictable, so the impact on
> results will vary. At the same time, investment income from trusts varies widely
> from one quarter to the next and has no corresponding cost of sales. As a result, its
> impact can be meaningful. *Absent the effect of these variable items, adjusted
> operating income for the 2015 first quarter increased by $2.1 million, or 15.7%.*
> (Emphasis added).

70.     Defendant Miller continued in relevant part, *"Looking behind the impact of the

irregular items we see strong continued performance from production-based revenues, adjusted

operating profit and distributable free cash flow.* We look forward to the further integration of

our acquired properties and the impact that continued growth in pre-need sales will have on cash

flow and profitability in the future."

71.     In truth, however, for the first time, the Company's non-GAAP financials struggled

to portray a financially healthy company. Unsurprisingly, as was the case throughout the Class

Period, StoneMor announced a public offering, seeking a capital injection to protect the cash

distributions StoneMor promised to be paid out through 2015. On July 6, 2015, StoneMor offered,

and on July 7, 2015, StoneMor priced, 2.1 million common units representing limited partner

interests in StoneMor at a price to the public of $29.63 per unit (the "July 2015 Offering"). Pursuant

to the accompanying prospectus, StoneMor: (1) expected to receive net proceeds of approximately

$58.9 million (or approximately $67.8 million if the underwriters exercised their option to purchase

an additional 315,000 common units), after deducting the underwriting discount and offering expenses in connection with the offering; and (2) intended to use the net proceeds to pay down outstanding indebtedness under its revolving credit facility. Underwriting the July 2015 Offering was Raymond James, representing Janney, Wunderlich Securities, Inc. ("Wunderlich"), BB&T and Landenburg Thalmann & Co., Inc. ("Landenburg").

72.     A mere 17-days following the close of the July 2015 Offering, which netted approximately $67.8 million in new capital, StoneMor announced an increased cash distribution of $0.65 per unit payable on August 14, 2015, up $0.01 from the previous quarter.

73.     Capitalizing on the July 2015 Offering, and the resulting increase in cash distributions promised to unit holders, StoneMor announced on August 10, 2015 its results for the three months ended June 30, 2015, filing with the SEC a Quarterly Report on Form 10-Q for the same period (the "2Q15 10-Q"). StoneMor reported, in relevant part, that:

- Revenues (GAAP) for the three months ended June 30, 2015 reached a record $80.8 million compared to $71 5 million for the three months ended June 30, 2014, a 13.0% increase.

- Production-based revenues (non-GAAP) for the three months ended June 30, 2015 reached a record $107.0 million compared to $86.9 million for the three months ended June 30, 2014, a 23.0% increase.

- Operating profits (GAAP) for the three months ended June 30, 2015 were $1.3 million compared to $3.3 million in the prior year period.

- Adjusted operating profits (non-GAAP) for the three months ended June 30, 2015 were $20.2 million compared to $14.3 million in the same period last year, a 41.8% increase driven largely by an increase in investment income from our trusts.

- Cash flows (GAAP) used in operations for the three month period ended June 30, 2015 were $1 9 million compared to $9.7 million provided by operations in the prior year period. The decline was driven primarily by the continued ramp up of pre-need sales which increased contributions into our trusts.

- Distributable free cash flow (non-GAAP) for the three-month period ended June 30, 2015 increased to $19.2 million from $15 4 million in the prior year period. The

increase was driven primarily by higher pre-need sales which generated increased inflows to the merchandise trust fund.

74.     Defendant Miller credited the Company's GAAP loss to "the deferral of revenues [], as well as a $3.5 million increase in corporate expenses arising from a combination of budgeting spending increases [...] and other expenses associated with the ongoing integration of new properties." Accordingly, he drew investors' attention to the "continued strength in [the Company's] revenue growth and distributable free cash flow[,] [which] allowed [StoneMor] to increase [its] distribution for the second quarter by $0.01 per unit to $0.65 per unit as previously announced."

75.     Prior to releasing the next quarter's financial results, StoneMor announced, on October 27, 2015, that it would again increase its cash distribution by $0.01, declaring a $0.66 per common unit distribution for the 3rd quarter 2015, which represented a 7% increase from the prior year 3rd quarter, and a 2% increase from the 2nd quarter of 2015.

76.     Then, on November 9, 2015, StoneMor filed its Quarterly Report on Form 10-Q with the SEC, announcing results for the third quarter of 2015 (the "3Q15 10-Q"). Therein, StoneMor, highlighted, for the first time and without offering any explanation as to why, the Company's Adjusted EBITDA and its Generated Distributable Available Cash, rather than its previously held "critical financial metrics" of Production-based Revenue, Adjusted Operating Profit, and Adjusted Operating Cash Generated.

77.     Upon information and belief, the Company often calculated so-called "Distributable available cash" to show that the distributions that were being made were less than the cash available on hand and that, therefore, such levels of distribution could be sustained. Moreover, the Company's abrupt transition away from its celebrated non-GAAP financial reporting metrics, to Adjusted EBITDA and Generated Distributable Available Cash likely was

23

because these figures told a more compelling story. For example, as stated in the 3Q15 10-Q, "Adjusted EBITDA, a non-GAAP measure, was $23.5 million for the 3rd quarter 2015, an increase of over 20% compared with the prior year 3rd quarter, [and] Generated Distributable Available Cash, a non-GAAP measure, [was] $32.2 million for the 3rd quarter 2015, [representing] a 7% increase from the prior 3rd quarter." Therefore, by emphasizing these non-GAAP metrics the Company could perpetuate the myth that the Company was generating funds *from its operations* to fund the distributions.

78.     The Company held an Investor and Analyst Day on November 11, 2015 to describe to unit holders the state of the business. In its presentation that day, the Company said its "Distributable Available Cash" at year-end 2013 and 2014 was $79 million and $80 million, respectively, showing growth in the cash available, despite the large distributions to unit holders during 2014. And yet, in its Earnings Release (filed with the SEC with a Form 8-K) on March 13, 2015, previously mentioned, the "Distributable Cash Available" at year-end 2013 and 2014 was shown to be $84 million and $73 million, respectively. Again, these material discrepancies existed without any explanation.

79.     Defendant McGrath would also explain at the Investor and Analyst Day on November 11, 2015, why the Company continued to emphasize non-GAAP financials and the disdain the Company had for the SEC's reporting requirements:

> "...I don't know if the SEC can get anymore screwed up with regard to revenue recognition rules. This might be a new level in terms of screwed up. So this is why we moved towards the non-GAAP. [...]But we look at how we characterize our cash flow on our press release and the non-GAAP measure of it. We remove all of the arcane and bizarre deferral rules. And we try to show people exactly, 'Listen, this is the activity we did during the period. This is what we generated. These are the costs associated with that.' And that's why you can feel comfortable that we generate enough cash flow to pay a distribution in this period."

24

80.     Eight days later, StoneMor announced, and entered into an At-the-Market Issuance Sales Agreement with FBR Capital Markets & Co. ("FBR"), MLV & Co. LLC ("MLV") and Janney (collectively, the "Agents"), wherein StoneMor "may sell from time to time through the Agents the Partnership's common units representing limited partner interests having an aggregate offering price of up to $100,000,000." (The "November 2015 Offering"). Again, the agreement stated that StoneMor intended to use the proceeds from this public offering, "after deducting the sales agents' commissions and the Partnership's offering expenses, to pay down outstanding indebtedness under its revolving credit facility." By December 31, 2015, StoneMor had issued 277,667 common units under the ATM program for net proceeds of $7.5 million.

81.     Also by year end 2015, the Company distributed approximately $77.51 million to its unitholders after raising $75.16 million through equity transactions.

82.     For the first time in six consecutive quarters, StoneMor did not announce an increase of its cash distribution for the fourth quarter of 2015 as part of its press release on January 26, 2016. Instead, Defendant Miller noted that the distribution represents a 5% increase over the prior year 4th quarter, and promised to "continue to contemplate further distribution increases as [StoneMor's] cash flow grows throughout calendar year 2016."

83.     About a month later, on February 29, 2016, StoneMor issued in a press release announcing its financial results for the fourth quarter and fiscal year 2015. Again, without providing any explanation as to the Company's reason for shying away from its previously relied on non-GAAP financial measures, StoneMor reported: (1) Adjusted EBITDA of $26.5 million, representing an increase of over 15% from the prior year period; (2) Calendar year 2015 Adjusted EBITDA of $98.2 million, showing an increase of almost 8% compared to the prior year; and (3)

Generated Distributable Available Cash of $30.5 million for the 4th quarter and $83.0 million for calendar year 2015.

84.     On the February 29, 2016 earning conference call to discuss fourth quarter 2015 financials, Defendant McGrath called the Company's management of the distribution "conservative," stating in relevant part:

> "...but I think when you look at the cash distributions, and I don't want to speak for Larry, Larry can chime in, but I think when we looked as where we were in the previous year with regard to covering distribution, we believe that we were managing our cash distribution probably a little conservatively versus where it could be managed."

85.     By March 7, 2015, these same figures, among others, had been filed on Form 10-K with the SEC as part of the Company's 2015 Annual Report (the "2015 Annual Report"). The 2015 Annual Report also addressed the Company's internal controls for financial reporting, stating in relevant part:

> As of the end of the period covered by this report, we carried out an evaluation, under the supervision and with the participation of our Disclosure Committee and management, including our Chief Executive Officer and our Chief Financial Officer, of the effectiveness of our disclosure controls and procedures pursuant to Exchange Act Rule 13a-15(b). Based upon, and as of the date of this evaluation, our Chief Executive Officer and our Chief Financial Officer *concluded that our disclosure controls and procedures were effective* to provide reasonable assurance that information we are required to disclose in our reports under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure. (Emphasis added).

86.     Then, on April 7, 2016, StoneMor announced another public offering (the "April 2016 Offering"), this time of 2 million common units representing limited partner interests in StoneMor. The Company priced the offering the following day at a price to the public of $23.65 per unit. By April 15, 2016, StoneMor had filed with the SEC a Registration Statement

announcing the April 2016 Offering. Proceeds net expenses were expected to be approximately $44.7 million (or approximately $51.5 million if the underwriters exercised their option to purchase an additional 300,000 common units in full). Underwriting the offering were Raymond James, Janney, Wunderlich, BB&T and Ladenburg.

87.     In the Registration Statement, StoneMor expressly stated that it "intend[s] to use the net proceeds from this offering, including any net proceeds from the underwriters' exercise of their option to purchase additional common units, *to pay down outstanding indebtedness under our revolving credit facility.*"

88.     The Registration Statement also expressly addressed the Company's quarterly distributions of available cash, stating that "[a]vailable cash for any quarter consists of cash on hand at the end of that quarter, plus cash on hand from working capital borrowings made after the end of the quarter but before the date of determination of available cash for the quarter, less cash reserves."

89.     On May 9, 2016, StoneMor filed with the SEC on Form 10-Q StoneMor's operating and financial results for the period ending March 31, 2016 (the "1Q16 10-Q"). Therein, the Company announced, yet again: (1) Adjusted EBITDA of $21.9 million compared to $21.7 million for the prior year; and (2) Generated Distributable Available Cash of $29.0 million compared to $25.9 million in the prior year, a purported increase of more than $3 million, or 12%. That same day, the Company issued a press release which the 1Q16 10-Q incorporated by reference.

90.     In the press release, Defendant Miller commented on StoneMor's performance, stating in relevant part:

> The first quarter is traditionally our most challenging, particularly in the area of pre-need sales....While we underperformed our own expectations for the 1st quarter, we continue to believe that we will accomplish our goals for 2016, which include achieving Adjusted EBITDA of at least $26 million for the 2nd quarter 2016, and full year Adjusted EBITDA between $106 million and $115 million.

91.    The 1Q16 10-Q also referred to StoneMor's April 2016 Offering, assuring investors, once again, that the proceeds from the issuance were used to pay down outstanding debt:

> On April 20, 2016, the Partnership completed a follow-on public-offering of 2,000,000 common units at a public offering price of $23.65 per unit. Net proceeds of the offering, after deducting underwriting discounts and offering expenses, were approximately $44.7 million. Additionally, the underwriters of the follow-on public offering exercised their option to purchase an additional 300,000 common units at the public offering price of $23.65 per unit, resulting in net proceeds of $6.8 million, after deducting underwriting discounts and offering expenses. *The proceeds from the issuances were used to pay down outstanding indebtedness under the Credit Facility.* (Emphasis added).

92.    On May 31, 2016, StoneMor announced that Defendant McGrath was slated to present at the Master Limited Partnership Association's 2016 Annual investor Conference scheduled for June 2, 2016 (the "MLP Conference"). While at the MLP Conference, Defendant McGrath responded to inquiries regarding the timing and amount of StoneMor's equity offering and the amount of its distributions. Defendant McGrath stated *"[wJe do not raise equity to pay distributions", "...we're able to turn those cash flows really into bottom line earnings to our investors and turn that into cash distributions for them", and "People say you raise equity to pay your distributions but that couldn't be further from the truth."*

93.    Then, on August 5, 2016, StoneMor filed with the SEC on Form 10-Q its operating and financial results for the period ended June 30, 2016 (the "2Q16 10-Q"). Among other things, the Partnership: (1) declared its 47th consecutive quarterly cash distribution, though the amount per unit remained the same, at $0.66; (2) reported Adjusted EBITDA of $23.0 million for the second

quarter, representing a decrease of $3.6 million compared to $26.6 million for the prior year period; and (3) reported Distributable Cash Flow of $16.8 million for the second quarter compared with 19.6 million for the prior year period, representing a decrease of $2.8 million. Evidently, even the Company's new non-GAAP financial measures could not yield positive results for the period.

94.     Defendant Miller blamed the Company's pre-need cemetery division sales and StoneMor's sales force, as a whole, for causing the Company's poor performance, stating in relevant part:

> While pre-need sales in our cemetery division rebounded strongly from the prior two quarters, they are not yet at levels we anticipated and were a significant driver of our shortfall to previously announced guidance for the period.
>
> We decided last year to focus our efforts on ensuring we have the highest quality salesforce possible and reducing salesforce turnover to better drive sales. In order to achieve these goals and be well positioned for future growth, we made structural changes which resulted in the elimination of our underperforming sales professionals. Because of our increased selectivity in filling these vacancies, headcount was slow to ramp, resulting in fewer salespeople engaging customers and pre-need sales falling below acceptable levels. The corrective action we are taking to improve overall sales perfoimance is taking longer than we expected to implement and yield results. We expect to announce additional measures in the coming weeks and once our salesforce returns to its optimal size and strength, we expect pre-need sales to return to targeted growth levels.

95.     In truth, however, upon information and belief, Defendant Miller knew that StoneMor was in financial jeopardy, relying on capital received from debt or equity offerings to pay out and maintain cash distributions in accordance with the General Partner's directive.

96.     Nonetheless, on September 2, 2016, Defendants issued a press release and filed a Form 8-K with the SEC, announcing that StoneMor intended to restate its consolidated financial statements for the fiscal years ended December 31, 2013 through 2015 and the fiscal quarters ended March 31, 2016 and June 30, 2016. Purportedly, according to the September 2, 2016 8-K filed with the SEC, "upon further review of prevailing accounting literature, and in consultation with the

29

Audit Committee of its Board of Directors, the partnership determined that it incorrectly allocated net loss to the general partner and its limited partners for the referenced historical periods."

97.     Rather than acknowledge the true impact on the Company's financials—notably, that the Company's accounting would have a significant impact on distributable cash flow, causing cash distributions to plummet—the press release announcing the restatement assured unitholders and analysts that, *"the restatement is not expected to have any impact to net income (loss), total assets, total liabilities, total partner's capital, Adjusted EBITDA, Distributable Cash Flow, or cash distributions."* (Emphasis added).

98.     The statements in ¶¶28-97 were false and misleading because StoneMor was using proceeds from debt offerings and equity issuances to pay distributions and not to pay down indebtedness under the Company's revolving credit facility, while simultaneously assuring investors that its "profit" distributions were safe based on the Company's manufactured and misleading non-GAAP financials. In truth, when the Company's access to the capital and debt markets dried up, the distribution was cut in half, damaging the Class.

## The Truth Begins to Emerge

99.     On October 27, 2016, after the market closed, the Company issued a press release announcing a quarterly cash distribution of $0.33 per common unit for the third quarter of 2016 — a 50% reduction over the previous quarter (the "October 27 Press Release"). The release stated, in relevant part:

> While 3rd quarter 2016 results are not yet final, preliminary data has led the General Partner and the Board of Directors to temporarily reduce the quarterly cash distribution to $0.33 per unit. This distribution level, along with previously announced cost savings measures totaling $7 million annually, will enhance StoneMor's liquidity by approximately $12 million in quarterly cash savings.

100.   Notably, this was the first time in over ten years that StoneMor declared a smaller distribution than the previous quarter.

101.   Rather than concede that StoneMor's business was not nearly as healthy as represented, Defendant Miller used the October 27 Press Release to blame the Company's fledgling sales force, suggesting it was the cause of the quarterly distribution cut. Specifically, Defendant Miller stated, "...we are working to re-grow our sales force, increasing both its quality and size." Miller continued, "[t]o accomplish this we have recently engaged a national recruiting firm, increased our in-house recruiting efforts, and hired a national vice-president of sales, all of which we expect will yield significant improvements in the months ahead."

102.   Then, Defendant Miller offered guidance for the next two quarters:

> While we are striving to accelerate the timeline of hiring and training additional sales talent, we estimate that this could take up to an additional six to nine months to attain the level of productivity we expect. We intend to provide monthly updates on the sales team expansion for greater visibility on our progress to the levels we are targeting. At that time, we will reassess the distribution and will look to reset it at the appropriate level.

103.   Reaction from analysts and the media was swift. On October 31, 2016, for example, *SeekingAlpha* published an article entitled, "StoneMor's Placebo Dividend," where StoneMor's dividend policy was placed under the spotlight and identified as "lack[ing] any real legitimacy." It was specifically noted that "...the confusion in the market regarding StoneMor's financial stability [was] the product of highly questionable non-GAAP accounting (Distributable Available Cash Flow, Accrual Adj. EBITDA) and materially misleading statements from the StoneMor Management team."

104.   The author then surmised that "StoneMor has historically met its distribution requirements by taking money from one group of investors and circling it through to another group of investors," citing for example how in 2015 "StoneMor *raised $75 million* from new

investors in the form of equity offerings and in turn *paid back to investors $77 million* in the form of a distribution." In other words, *97% of the cash paid to investors was the direct, dollar-for-dollar transfer from new investors to old investors.*

105.   On November 9, 2016, StoneMor filed with the SEC on Form 8-K a Current Report stating its operating and financial results for third quarter 2016 (collectively, the 3Q16 8-K"). Revenues equaled $78,536,000 compared to $81,768,000 for the prior year, and distributable cash flow equaled $11,071,000 compared to $18,811,000. The Company again affirmed its cash distribution of $0.33.

106.   Defendant Miller expressed disappointment over the performance, and continued to blame the Company's sales force, stating that StoneMor was experiencing "slower than expected progress [ ] in increasing recruitment and other initiatives."

107.   Additionally, in the 3Q16 8-K, StoneMor again noted that "it expects to amend its Form 10-K for the fiscal year ended December 31, 2015, and its Forms 10-Q for the quarterly periods ended June 30, 2016 and March 31, 2016," and that the Company had "previously disclosed that it would amend these filings ... on September 2, 2016." However, this time, it was revealed that the Company had to "record additional adjustments to its consolidated financial statements for the period referenced upon further review of those statements during an ordinary course review by the Securities and Exchange Commission." The 3Q16 8-K summarized those "additional adjustments" as follows:

- The presentation of certain components of "cemetery property", "Property and equipment, net of accumulated depreciation", "Goodwill and intangible assets", "Deferred cemetery revenues, net", "Merchandise liability", "Accounts payable and accrued liabilities" and "Common limited partners' interest";

- The presentation of "Cemetery merchandise revenues", "Cemetery service revenues", and "Cost of goods sold" related to assumed performance obligations from acquisitions;

- The recording of incorrect amounts of investment revenues and expenses related to merchandise and perpetual care trusts on the consolidated statement of operations and the incorrect tracking of perpetual care-trusting obligations on the consolidated balance sheet;

- The recognition of incorrect amounts of revenue from deferred pre-acquisition contracts in the consolidated statement of operations based on inaccurate system inputs;

- Other adjustments principally relating to the recognition, accuracy and/or classification of certain amounts in "Deferred cemetery revenues, net", "Merchandise liabilities", and "Other current assets", and

- The corresponding effect of the foregoing accounting errors on the Partnership's income tax accounts.

108.   Defendants would also disclose that *"there were material weaknesses in the Company's internal control over financial reporting as of December 31, 2015, and [that] the Company's disclosure controls and procedures for the affected periods referenced above were not effective."* (Emphasis added).

109.   Finally, Defendant McGrath noted, despite StoneMor's long-held stance that non-GAAP metrics are more illustrative of the actual financial condition of the Company, "the format of [StoneMor's] earnings release has changed from previous quarters... [such that], we will no longer be able to provide Adjusted EBITDA as a performance metric within future earnings releases."

110.   StoneMor's stock has continued its downward trajectory, trading as low as $8.29 a share in the weeks following the announced distribution cut.

33

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

111.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired StoneMor units during the Class Period (the "Class") and were damaged thereby. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

112.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, StoneMor units were actively traded on the New York Stock Exchange ("NYSE"). While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by StoneMor or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

113.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

114.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

115. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of StoneMor;

- whether the Individual Defendants caused StoneMor to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of StoneMor units during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

116. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

117. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## APPLICABILITY OF PRESUMPTION OF RELIANCE

118. Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 1288 (1972) because the claims asserted herein against Defendants are predicated upon omissions of material fact which there was a duty to disclose.

35

119.    In the alternative, Plaintiff is entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud on the market doctrine for the following reasons set forth below.

120.    The market for the units was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, the units traded at artificially inflated prices during the Class Period, Plaintiff and other members of the Class purchased or otherwise acquired the units relying upon the integrity of the market price of the units and market information relating to StoneMor, and have been damaged hereby.

121.    During the Class Period, the artificial inflation of the units was caused by the material misrepresentation and omissions particularized in this Complaint caused the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about StoneMor's financial viability and ability to continue to pay quarterly distributions. These material misstatements and/or omissions created an unrealistically positive assessment of the Company and its business, operations, and prospects, thus causing the price of the units to be artificially inflated at all relevant times, and when disclosed negatively affected their value. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the units at such artificially inflated prices, and each of them has been damaged as a result.

122.    At all relevant times, the market for StoneMor units was an efficient market for the following reasons, among others:

(a)    StoneMor units met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, StoneMor filed periodic public reports with the SEC and/or the NYSE;

(c)     Defendants regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or;

(d)     StoneMor was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

123. As a result of the foregoing, the market for StoneMor units promptly digested current information regarding StoneMor from all publicly available sources and reflected such information in the price of the units. Under these circumstances, all purchasers of StoneMor units during the Class Period suffered similar injury through their purchase thereof at artificially inflated prices and a presumption of reliance.

## LOSS CAUSATION

124. Defendants' wrongful conduct as alleged herein directly and proximately caused the economic loss suffered by Plaintiff and the Class. During the Class Period, Plaintiffs and the Class purchased or acquired StoneMor units at artificially inflated prices and were damaged thereby. The price of the units significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses. Following disclosure that StoneMor's third

quarter 2016 distribution would be cut in half, the price of the units declined by more than 45% on October 27, 2016 on heavy trading volume.

## NO SAFE HARBOR

125.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of StoneMor who knew that the statement was false when made.

## COUNT I

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants StoneMor, Miller, McGrath and Yost**

126.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

127.    During the Class Period, Defendants StoneMor, Miller, McGrath and Yost carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period,

did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase StoneMor units at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

128.   Defendants StoneMor, Miller, McGrath and Yost (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material filet and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for StoneMor's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. Defendants StoneMor, Miller, McGrath and Yost are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

129.   Defendants StoneMor, Miller, McGrath and Yost, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about StoneMor's financial well-being and prospects, as specified herein.

130.   These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of StoneMor's value and performance and continued substantial growth, which included the making of or the participation in the making of untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about StoneMor's and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more

particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

131.    These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of StoneMor's value and performance and continued substantial growth, which included the making of or the participation in the making of untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about StoneMor's and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

132.    Each of Defendants Miller, McGrath and Yost's primary liability, and controlling person liability, arises from the following facts: (i) the Defendants Miller, McGrath and Yost were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

133. Defendants Miller, McGrath and Yost had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing StoneMor's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants Miller, McGrath and Yost's overstatements and/or misstatements of the Company's business, operations, financial wellbeing, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

134. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of StoneMor's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired StoneMor's securities during the Class Period at artificially high prices and were damaged thereby.

135.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that StoneMor was experiencing, which were not disclosed by Defendants Miller, McGrath and Yost, Plaintiff and other members of the Class would not have purchased or otherwise acquired their StoneMor securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

136.    By virtue of the foregoing, Defendants StoneMor, Defendants Miller, McGrath and Yost have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

137.    As a direct and proximate result of Defendants StoneMor, Miller, McGrath and Yost's wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act Against the Individual Defendants

138.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

139.    The Individual Defendants acted as controlling persons of StoneMor within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the

decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

140.    In particular, each of these Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.

141.    As set forth above, StoneMor and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' wrongful conduct. Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: December 1, 2016

Respectfully submitted,

**POMERANTZ LLP**

*Jayne A. Goldstein* /SA

Jayne A. Goldstein (PA Bar No.: 48048)
1792 Bell Tower Lane, Suite 203
Weston, Florida 33326
Telephone: (954) 315-3454
Facsimile: (954) 315-3455
Email: jagoldstein@pomlaw.com

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood II
Marc C. Gorrie
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
            ahood@pomlaw.com
            mgorrie@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

***Attorneys for Plaintiff***

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.   I, <u>Steve Klein</u>, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.   I have reviewed a Complaint against StoneMor Partners L.P. ("StoneMor" or the "Company"), and authorize the filing of a comparable complaint on my behalf.

3.   I did not purchase or acquire StoneMor securities at the direction of plaintiffs counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.   I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired StoneMor securities during the class period, including providing testimony at deposition and trial, if necessary.   I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.   To the best of my current knowledge, the attached sheet lists all of my transactions in StoneMor securities during the Class Period as specified in the Complaint.

6.   During the three-year period preceding the date on which this Certification is signed, I have sought to serve as a representative party and/or filed a complaint on behalf of a class under the federal securities laws in the following actions:

- *Masillionis v. Silver Wheaton Corp. et al.*, 2:15-cv-05146 (C.D. Cal. July 8, 2015); and

- *Klein v. Wells Fargo & Company et al.*, 3:16-cv-05513 (N.D. Cal. Sept. 28, 2016).

7.   I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.   I declare under penalty of perjury that the foregoing is true and correct.

Executed ___11/3/2016___
            (Date)

_____
(Signature)

_____
(Type or Print Name)

**STONEMOR PARTNERS LP (STON)**                                    **Klein, Steve**

### LIST OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|------|------------------|-------------------|-----------------|
| 1/25/2016 | Purchase | 200 | $26.8600 |